## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**KENNETH CARL SALAZAR, JR.**

      Plaintiff,

v.

**IMG ACADEMY**
D/B/A/ NCSA COLLEGE
RECRUITING
/IMG ACADEMY

**LISA M. STRASMAN,**
in her individual capacity as
Chief People Operations Officer,

**MICHAEL J. LADD,**
in his individual capacity as
Supervisor,
and

**JOEL GROSSMAN,**
in his individual capacity as
Executive,

      Defendants.

Case No.: 8:26-cv-1092-JLB-TGW

APR 15 2026 PM3:44
FILED - USDC - FLMD - TPA

**JURY TRIAL
DEMANDED**

## COMPLAINT FOR VIOLATIONS OF THE FAMILY AND MEDICAL LEAVE ACT (FMLA), 29 U.S.C. §§ 2601 et seq., TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONSHIP, DEFAMATION PER SE, AND BAD FAITH THREATS TO COMPEL ARBITRATION (FLORIDA ABUSE OF PROCESS)

IFP

## NATURE OF THE ACTION

1.     This action arises from Defendants' willful interference with and retaliation against Plaintiff's protected FMLA rights.

2.     Plaintiff was employed by Defendant NCSA/IMG Academy from on or around November 27, 2023, through July 2, 2025. During this tenure, Plaintiff served in a high-level technical capacity, managing critical infrastructure projects and consistently operating at an elite professional level.

3.     Throughout this period, Plaintiff served as a mission-critical asset, a designation substantiated by his role in remediating high-stakes federal compliance gaps while the company was under active investigation by the U.S. Treasury's Office of Foreign Assets Control (OFAC).

4.     Specifically, following the discovery of systemic sanctions violations—which recently culminated in a $1.72 million federal penalty[1]—Plaintiff was the sole developer tasked with the original implementation of the automated background check and OFAC screening process designed to satisfy Department of Justice (DOJ) mandated compliance requirements.

5.     Plaintiff's work provided the essential technical infrastructure required to address the company's "reckless disregard" for federal law and was central to maintaining its regulatory standing during a period

of intense federal scrutiny.

6.    Amongst other critical assignments, Plaintiff continued to play a central role in improving and making refinements to this system during his tenure, which remained essential to maintaining the company's federal regulatory standing.

7.    Defendant Michael Ladd ("Defendant Ladd") had actual and constructive notice of Plaintiff's serious health condition. For approximately seven months leading up to the leave request, Ladd observed Plaintiff's visible physical and emotional distress during weekly one-on-one meetings.

8.    Plaintiff broke down in tears on multiple occasions in front of Ladd and other leadership, explicitly discussing the extreme toll that exacerbation of his pre-existing condition was taking on him.

9.    In response, Defendant Ladd and Nonparty Truby encouraged Plaintiff to take paid leave.

10.    On those occasions, Plaintiff explicitly stated to both Defendant Ladd and Nonparty Truby that he felt unable to exercise his right to take leave due to a well-founded fear that doing so would result in the retaliatory termination of his employment.

11.    Despite this knowledge, Defendants failed to initiate the FMLA process or offer accommodations until Plaintiff was forced into an emergency leave.

12.    On June 17, 2025, Plaintiff provided clear written notice to his supervisor, Defendant Ladd, of a serious health condition and initiation of FMLA-protected medical leave. That notice is shown below.



13.    Defendants acknowledged the notice, processed the absence as approved leave in payroll, yet failed to issue any eligibility or rights-and-responsibilities notices, failed to designate the leave as FMLA-protected. (**Exhibit A**, *Email Correspondence*)

14.    On June 18, 2025, the day immediately following Plaintiff's written notice to Defendant Ladd, NCSA/IMG Academy benefits representative Rachel Newton sent Plaintiff the following email:

> *Good afternoon, Carl,*
> *I am sorry to hear that you're going*
> *through a hard time!*
>
> *I would be happy to talk about the FMLA*
> *process and see how we can support you.*
>
> *Book Time With Me!*
>
> *Thank you,*
>
> *Rachel*

15.    This communication—originating from Defendants' own

Human Resources and Benefits team—confirms that Defendants had actual, institutional knowledge of Plaintiff's serious health condition and FMLA-qualifying leave no later than June 18, 2025.

16. The email provided no eligibility notice, no rights-and-responsibilities notice, no designation notice, and no formal FMLA paperwork—in direct violation of Defendants' non-delegable obligations under 29 C.F.R. §§ 825.300–825.301.

17. Instead, Newton's email directed Plaintiff to independently schedule a meeting via a calendar link—impermissibly shifting the administrative burden of FMLA processing onto the employee.

18. Critically, Plaintiff bore no legal obligation whatsoever to read, let alone respond to, employment-related correspondence during this period.

19. An employee on FMLA-protected leave is not required to monitor or act upon work-related communications from their employer; the entire obligation to designate the leave, issue required notices, and initiate the FMLA process rested affirmatively and exclusively with Defendants once sufficient notice was provided. See 29 C.F.R. § 825.302(d); see also *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 246 (6th Cir. 2004).

20. Defendants' subsequent characterization—in their July 2, 2025 termination correspondence—that the benefits team had been

"unsuccessful in reaching" Plaintiff is therefore not a defense; it is a frank admission that Defendants were fully aware of the leave and nonetheless failed to fulfill their statutory duties, choosing instead to terminate Plaintiff for "job abandonment" while he remained on a leave they themselves acknowledged. (**Exhibit A**, *Email Correspondence*)

21. Following Newton's June 18, 2025 email, Defendants made no further attempt to contact Plaintiff whatsoever—no phone calls, no follow-up emails, no written correspondence, and no effort of any kind to communicate with him during the entirety of his protected leave period.

22. Plaintiff was never informed that his employment was in jeopardy, that a termination was being considered, or that any deadline to respond or return had been imposed.

23. Plaintiff did not learn that he had been terminated until the afternoon of July 2, 2025, when he received a litany of automated email notifications alerting him that he had been abruptly removed from corporate code repositories, communication platforms, and other company resources without prior notice or explanation—prompting Plaintiff to email Human Resources and Nonparty Toney directly to inquire whether he had been terminated. (**Exhibit A**, *Email Correspondence*)

24.   The fact that Plaintiff was forced to ask whether he had been fired—rather than being formally notified—is itself a stark illustration of Defendants' complete abdication of their obligations under the FMLA and basic principles of fair dealing.

25.   That Defendants simultaneously characterized this same period as "job abandonment—while having made a single, generic, calendar-link email their only attempted contact over the entire leave period—renders that characterization not merely pretextual, but demonstrably false on its face.

26.   Defendants terminated Plaintiff on July 2, 2025—mid-remaining protected period—under the pretext of "job abandonment" and "pending criminal charges" they "suddenly became aware of" only after Plaintiff's June 30, 2025 court communications from his NCSA work email. (**Exhibit B**, *IMG Academy Termination Letter (20250702)*)

27.   Defendants weaponized pending, unadjudicated, and per the related matter's record, demonstrably baseless charges precisely during protected FMLA leave, compounding the economic and personal harm caused by both the accusation and the unlawful termination.

28.   This pretextual termination—occurring while Plaintiff was on protected FMLA leave—resulted in the immediate loss of Plaintiff's $157,500 annual salary.

29.   As a direct and proximate result of this sudden loss of

income, Plaintiff suffered a total collapse of financial stability, leading to the loss of his residence and subsequent homelessness.

30. The resulting financial devastation led to Plaintiff's displacement from his home in late 2025 and necessitated seeking emergency shelter throughout early 2026.

31. These facts establish willful FMLA violations entitling Plaintiff to back pay, front pay (multi-year projection given career destruction and stigma), liquidated (double) damages, benefits restoration, interest, and attorney's fees. Supplemental Florida tort claims unlock uncapped punitive and noneconomic damages for the malicious pretext and reputational destruction.

32. Plaintiff seeks damages in an amount to be determined at trial, but no less than Ten Million Dollars ($10,000,000).

## JURISDICTION AND VENUE

33. This Court has original federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617(a)(2). The Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a), as they arise from the same nucleus of operative facts.

34. Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims occurred here (Plaintiff's employment, notice of leave, processing of leave, and termination all

in or near Bradenton/Tampa area), and Defendant NCSA maintains its principal place of business in Bradenton, Florida.

## PARTIES AND RELEVANT NONPARTIES

35.    Plaintiff Kenneth Carl Salazar, Jr. is an individual residing in Temple Terrace, Florida. He was employed by Defendant IMG Academy in a Senior Data Engineer role with an annual salary of approximately $157,500 until his wrongful termination on July 2, 2025.

36.    Defendant NCSA College Recruiting (d/b/a NCSA/IMG Academy) is a Florida entity with its principal place of business at 5725 Bollettieri Blvd., Bradenton, FL 34210. It is an "employer" under the FMLA (50+ employees within 75 miles).

37.    Defendant Lisa M. Strasman is sued in her individual capacity as Chief People Operations Officer; she exercised control over Plaintiff's employment, leave processing, and termination decisions.

38.    Defendant Michael J. Ladd is sued in his individual capacity as Plaintiff's supervisor; he received Plaintiff's FMLA notice, acknowledged it, directed Plaintiff to HR, and participated in the termination decision.

39.    Defendant Joel Grossman is sued in his individual capacity as an executive; he was involved in or had authority over the termination and related decisions.

40.     Each Individual Defendant constitutes an "employer" under 29 U.S.C. § 2611(4)(A)(ii)(I) as a person who acted, directly or indirectly, in the interest of NCSA in relation to Plaintiff and exercised supervisory authority over Plaintiff's employment, leave administration, and termination.

41.     Plaintiff was an "eligible employee" under the FMLA, having been employed by NCSA for at least twelve (12) months and having worked at least 1,250 hours during the twelve (12) months immediately preceding commencement of leave.

42.     Nonparty Angie Muchow Truby ("Nonparty Truby") was, at all relevant times, a Product Manager at NCSA/IMG Academy. Truby worked closely with Plaintiff and Defendant Ladd and is a witness to the physical and emotional manifestations of Plaintiff's serious health condition and Defendants' notice thereof.

## FACTUAL BACKGROUND

43.     Prior to Plaintiff's termination, Defendant Ladd engaged in retaliatory conduct.

44.     On May 6, 2025, during a one-on-one meeting, Plaintiff raised concerns about ongoing disparate treatment that had been occurring for an extended period and had recently intensified.

45.     Defendant Ladd reacted incredulously and asked whether Plaintiff had documentation supporting these concerns; Plaintiff

confirmed that he did. Defendant Ladd responded, "Good, you're going to need it very soon," and stated that he would be speaking with Human Resources.

46. After this exchange, the disparate treatment Plaintiff had reported not only continued but further escalated.

47. At or about 5:30 PM, Friday, June 13, 2025, effectively one (1) business day prior to Plaintiff's initiation of FMLA-protected leave, Plaintiff submitted a written follow-up communication in Slack documenting that the disparate treatment had continued and worsened.

48. That message was written in a restrained and professional tone, expressed appreciation for colleagues, and sought constructive resolution of ongoing workplace issues. Rather than responding to the concerns raised, Defendant Ladd disregarded the substance of the communication and instead issued unrelated criticism, further evidencing the continuing pattern of retaliatory treatment.

49. This retaliatory conduct is consistent with behavior Plaintiff previously observed at the February 2024 company Summit, where an immaterial professional disagreement occurred between Defendant Ladd and then-Vice President of Analytics & Data Science Deeraj Haridas.

50. Following that event, Defendant Ladd repeatedly referenced

the disagreement in team meetings and one-on-one discussions, and the interpersonal tension persisted well after the incident.

51.    Defendant Ladd and Joel Grossman also share prior professional background at Leapfrog Online, a fact that was openly discussed internally and reflected a closely aligned working relationship that was widely recognized within the team.

52.    Shortly thereafter, Mr. Haridas's dismissal followed, reinforcing Plaintiff's concern that disagreements with certain leadership personnel could result in adverse professional consequences.

53.    Throughout Plaintiff's employment, Plaintiff consistently utilized less paid time off than other members of his team.

54.    In the period immediately preceding Plaintiff's medical leave, multiple team members went on extended vacations, including two-week personal travel leave, while Plaintiff's supervisor, Defendant Ladd, was simultaneously encouraging Plaintiff to take time off due to the visible physical and medical strain Plaintiff had been experiencing for several months.

55.    Defendant Ladd, along with Product Manager Nonparty Truby, were therefore fully aware of Plaintiff's ongoing health difficulties and Plaintiff's repeated reluctance to take leave because of Plaintiff's stated concern that doing so might jeopardize Plaintiff's

employment.

56.    Despite these discussions—during which Plaintiff was repeatedly assured that the purpose of leave benefits was to allow employees to address self-care and health needs without adverse employment consequences—Plaintiff nevertheless remained concerned that using ordinary PTO could jeopardize his position and therefore elected to initiate unpaid, federally protected FMLA leave to obtain necessary treatment, with the understanding and expectation, consistent with federal law, that such leave was protected from adverse employment action.

57.    The subsequent decision to characterize Plaintiff's absence as "job abandonment," despite prior knowledge of Plaintiff's medical condition, documented notice of leave, and the company's own approval of comparable or longer absences for other employees, further demonstrates the inconsistency and retaliatory nature of the termination decision.

58.    In its July 2, 2025 termination correspondence, the company stated that "since your last communication with the company on June 17th, we have become aware of pending criminal charges filed against you while actively employed and acknowledge that you failed to report these to the Company in a timely manner as per our Team Member Handbook."

59.    This secondary justification is itself pretextual and reveals the company's intent: rather than treating Plaintiff's FMLA leave as protected, the company retroactively weaponized long-known charges as a basis for termination precisely because Plaintiff was on leave and unavailable to self-report.

60.    That same Handbook, along with all company documentation across three separate HR platforms and the entirety of the company's Slack communications dating back several years, contains no mention whatsoever of FMLA, its protections, or any related reporting or leave procedures.

61.    This omission itself violates the FMLA's notice requirements and undermines any claim that Plaintiff was obligated to self-report under company policy.

62.    The company had, however, permitted Plaintiff's continued employment for approximately seven months after the underlying arrest without any interruption in Plaintiff's duties or performance.

63.    This "awareness" emerged immediately after Plaintiff's June 30, 2025 communication to the criminal court—sent from Plaintiff's NCSA work email address, which Plaintiff had never used in any prior communications with anyone involved in the criminal case outside of work—and which court records confirm was forwarded to five recipients, all officers of the court, including prior counsel whom

Plaintiff had terminated for cause.

64.    In light of this timing and the sudden assertion that the company had "become aware" of charges that had not previously impeded Plaintiff's employment—despite over ten (10) weeks of federally protected FMLA leave remaining—Plaintiff demanded a full and complete written disclosure of the means, manner, timing, and sources by which the company and its personnel first "became aware" of those criminal proceedings in his March 15, 2026 correspondence (**Exhibit C,** *Notice of FMLA Interference and Wrongful Termination and Demand for Disclosure, Back Pay, and Statutory Damages*)

65.    Plaintiff demanded that disclosure include identification of each individual and entity who communicated information about the charges to any NCSA or IMG Academy representative; the dates, times, and channels of each such communication; and any internal discussions or assessments reflecting how that information was used in connection with Plaintiff's employment status and termination decision.

66.    This information is directly relevant to evaluating the extent to which the termination decision was infected by improper dissemination of confidential court communications, pretextual reasoning, potential tortious interference, and retaliatory motives tied

to Plaintiff's protected medical leave and Plaintiff's efforts to defend himself in the underlying case.

67. On March 15, 2026, the same day he provided notice to Defendants, Plaintiff initiated a formal complaint with the U.S. Department of Labor Wage and Hour Division and other appropriate regulatory agencies.

68. The company was thereby placed on notice of these statutory violations under the FMLA.

69. Plaintiff performed satisfactorily throughout his employment, consistently utilizing less paid time off than other members of his team.

70. In the months leading to June 2025, Plaintiff developed a serious health condition qualifying for FMLA leave.

71. On June 17, 2025, Plaintiff provided written notice to supervisor Michael Ladd that he was entering medical leave due to a serious health condition and was awaiting confirmation from Human Resources regarding the company's FMLA processing procedures.

72. Management acknowledged this communication and directed him to Human Resources for processing.

73. NCSA's leave-request system offered no FMLA option, forcing employees to select normal PTO while awaiting administrative designation by HR, which is consistent with federal regulations

placing designation obligations on the employer once sufficient notice is provided.

74. Payroll records reflect that the company processed paid time off during the same period, confirming that the company recognized Plaintiff's absence as authorized leave.

75. No FMLA eligibility/designation notices were issued as required by law.

76. Prior to termination, Defendant Ladd engaged in retaliatory conduct. On May 6, 2025, during a one-on-one meeting, Plaintiff raised concerns about ongoing disparate treatment.

77. Defendant Ladd reacted incredulously and stated, "Good, you're going to need it very soon," and that he would be speaking with Human Resources.

78. After this exchange, the disparate treatment continued and escalated. On June 13, 2025, Plaintiff submitted a written follow-up in Slack documenting that the disparate treatment had worsened. Rather than addressing the concerns, Defendant Ladd issued unrelated criticism.

79. In the related criminal matter (*State of Florida v. Kenneth Carl Salazar*, Case No. 2024-CF-016188-A-O), prior counsel abandoned Plaintiff, filed a fraudulent motion to withdraw post-termination for cause, invoking Defendant's name, voice, and agency in direct

contradiction to his written repudiation of the proposed motion, removed his signature block, and filed it without notice against Plaintiff's consent, then continued to withhold his case file.

80. On June 30, 2025, while still on FMLA leave and en route from out-of-state on a punctured run-flat tire, Plaintiff emailed the criminal court at 9:23 a.m. from his NCSA work email address (which he had never used in any prior communications with anyone involved in the criminal case outside of work).

81. Plaintiff attached tire photos, GPS location, FMLA documentation, and portions of an emergency motion. He engaged in ten documented communications (55+ minutes of calls to Judicial Assistant Peel and multiple Webex sessions).

82. The court acknowledged his circumstances in writing and represented no capias would issue if he appeared that afternoon. Despite this, a capias issued mid-morning, with the docket reflecting "Issue Capias," "Revoke Bond," and "Failure to Appear" before 11:00 a.m. Plaintiff reasonably declined to enter the courthouse under an active warrant.

83. That same June 30 communication from Plaintiff's NCSA work email triggered Defendants' "sudden awareness" of the pending criminal charges—charges they had known about for seven months without issue.

84.    On July 2, 2025, Defendants terminated Plaintiff mid-remaining FMLA period (~10 weeks), citing "job abandonment" and failure to report the charges per the handbook—despite payroll approval of the leave, no contact attempts, and disparate treatment of other employees' extended absences.

85.    The termination letter explicitly referenced the charges "discovered" immediately after the June 30 work-email court filing. In its July 2, 2025 termination correspondence, the company stated that "since your last communication with the company on June 17th, we have become aware of pending criminal charges filed against you while actively employed and acknowledge that you failed to report these to the Company in a timely manner as per our Team Member Handbook."

86.    In the related criminal matter, the record now contains extensive evidentiary materials through tangential filings alone—including exonerating video evidence that directly contradicts the allegations—demonstrating Plaintiff's factual innocence.

87.    Plaintiff is awaiting proper adjudication and strongly encourages the company and its counsel to review these filings and exhibits to understand both the factual record and the full extent of

the cascading harms Plaintiff has incurred, as well as the seriousness with which Plaintiff pursues vindication of his rights as a litigant.

88. To the extent the company relied on this pending, unadjudicated accusation as a basis for employment decisions, doing so while Plaintiff was on protected medical leave and actively contesting the allegations with substantial exculpatory proof compounded the economic and personal harm caused by both the baseless accusation and the unlawful termination, and further violated the Family and Medical Leave Act's prohibition on using protected leave as a negative factor in employment actions.

89. The termination caused immediate and cascading harms.

90. Plaintiff lost all income and benefits.

91. The active capias (stemming directly from the FMLA-protected period) prevented stable housing and employment.

92. By January 2026, he was sleeping in a public bathroom for shelter. Reinstatement is impossible due to hostility, pretext, and destroyed trust.

93. Comparable re-employment is foreclosed by the stigmatizing "abandonment" and "criminal charges" label disseminated internally.

94.    These harms were foreseeable and directly caused by Defendants' willful FMLA violations.

95.    In response to the aforementioned misconduct from his prior counsel in the related criminal matter,, Plaintiff filed a 117-page emergency motion to vacate addressing the fraud on the court that tainted the proceedings from which the wrongful capias flowed, the entirety of prior counsel's misconduct, and the conspicuous circumstances implicating her involvement in the tortious interference at issue in this matter.

96.    Plaintiff subsequently filed a Florida Bar complaint addressing the extraordinary misconduct involved, and filed a motion to quash the capias, which was granted.

97.    Plaintiff further moved to disqualify the presiding judge on grounds of gross prejudice; that motion too was granted, resetting the case and reassigning it to a new judge.

98.    All remaining remedies and relief sought in that matter await proper adjudication.

99.    On March 15, 2026, Plaintiff sent a formal demand letter via certified mail and email detailing the violations (including the exonerating evidence in the criminal record) and demanding immediate payment of $30,270 in back pay ($157,500 annual compensation ÷ 52 weeks × 10 weeks), plus full restoration of

benefits, benefit-continuation costs, liquidated damages, statutory interest, front pay, and attorney's fees recoverable under FMLA. (**Exhibit C,** *Notice of FMLA Interference and Wrongful Termination and Demand for Disclosure, Back Pay, and Statutory Damages*)

100. This $30,270 back-pay demand was exclusive of all other remedies.

101. Plaintiff also demanded a complete written disclosure of the means, manner, timing, and sources by which the company first "became aware" of the criminal proceedings.

102. Defendants failed to respond by the by the March 20, 2026 deadline, further evidencing bad faith and willfulness.

103. On March 25, 2026, counsel for Defendants issued a written response to Plaintiff's pre-litigation notice that fundamentally shifted the defense narrative, admitting for the first time that the termination—originally characterized as "job abandonment" on July 2, 2025—would have occurred "regardless" due to Plaintiff's December 2024 arrest.

104. This attempt to retroactively justify the termination by citing an unadjudicated arrest from seven months prior exposes a

transparent effort to manufacture a non-discriminatory reason for a retaliatory act.

105. Defendants tolerated the existence of this arrest throughout the entirety of Plaintiff's high-performing tenure, only choosing to weaponize it at the exact moment Plaintiff initiated protected FMLA leave.

106. This shifting and inconsistent justification constitutes clear evidence of pretext designed to mask a willful FMLA violation.

107. Defendants permitted Plaintiff's continued employment for seven (7) months following the arrest without incident, yet claimed a sudden "awareness" and basis for immediate dismissal only 48 hours after Plaintiff utilized his work email to communicate with the court regarding his medical and legal situation.

108. This move from "job abandonment" to "failure to report an arrest" demonstrates a bad-faith pivot that fails to account for the seven months of inaction, proving the arrest was merely a convenient hook used to finalize a termination mid-protected leave.

## FMLA LEGAL STANDARD

109.  Under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et.seq., an employee is not required to use any particular words or obtain advance managerial "approval" in order to invoke statutory leave protections; it is sufficient to provide notice that leave is needed for a potentially FMLA-qualifying serious health condition.

110.  Once the employer has enough information to reasonably determine that an absence may qualify, the responsibility shifts to the employer to provide the required eligibility, rights-and-responsibilities, and designation notices and to treat the absence as FMLA-protected, rather than penalizing the employee for using leave. See *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002) (recognizing the employer's regulatory obligation to designate qualifying leave as FMLA-protected and provide required notices); *Hurley v. Kent of Naples, Inc.*, 746 F.3d 1161 (11th Cir. 2014) (applying FMLA protections within the Eleventh Circuit, including Florida, and explaining that employees need only give sufficient notice of the need for qualifying leave).

## DEFENDANTS' WAIVER AND INHERENT UNENFORCEABILITY OF ARBITRATION AGREEMENT UNDER *MORGAN V. SUNDANCE, INC.,* INCLUDING STRUCTURAL DEFECTS AND UNCONSCIONABILITY

111. Any arbitration agreement previously cited or relied upon by Defendants is unenforceable and has been waived through inconsistent conduct.

112. On March 25, 2026, Defendants explicitly engaged the merits of Plaintiff's FMLA claims by issuing a detailed legal defense, denying all liability, and asserting specific factual defenses—including characterizing Plaintiff's protected leave as a "sham"—without any reservation of rights or mention of arbitration. (**Exhibit D**, *March 25 Letter*).

113. Only after Plaintiff provided formal notice of the federal filing (March 25, 3:51 PM) did Defendants first invoke arbitration on March 26, 2026.

114. This tactical pivot was accompanied by a threat to "move to compel arbitration and seek the fees and costs of doing so" against a plaintiff left homeless as a consequence of Defendants' actions and the cascading harms thereof, while acting in good faith—a demand that is baseless as a matter of law, as the Federal Arbitration Act (FAA) provides no statutory mechanism for fee-shifting in this context. (**Exhibit E**, *Grob Emails*).

115. Under the Supreme Court's holding in *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), a party waives its right to arbitrate by acting inconsistently with that right.

116. The Court clarified that "prejudice" to the opposing party is irrelevant; the focus is solely on the Defendants' conduct.

117. By litigating the merits on March 25 and invoking arbitration only after the suit became "live," Defendants have waived any right to compel a non-judicial forum.

118. Defendants may contend that pre-suit correspondence does not constitute "litigation conduct" sufficient to trigger waiver under *Morgan*. This argument fails for three independent reasons.

    i.   **First**, Morgan's waiver standard focuses on conduct "inconsistent with the right to arbitrate"—not on whether a complaint has been filed. The Supreme Court explicitly rejected any prejudice requirement and any arbitration-specific procedural rule. *Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022). Defendants' March 25 letter engaged the substantive merits of Plaintiff's FMLA claims in detail— denying liability, asserting factual defenses, and characterizing protected leave as a "sham"—without any reservation of arbitral rights whatsoever. That is conduct inconsistent with arbitration regardless of docket status.

    ii.   **Second**, the Eleventh Circuit and post-Morgan courts have applied waiver findings to pre-suit conduct where a party substantively litigated the merits. The relevant question is not timing—it is whether the party acted as though no

arbitration agreement existed. Defendants did precisely that on March 25, 2026.

iii. **Third**, Defendants' tactical pivot—engaging merits on March 25 then demanding arbitration on March 26 only after the federal complaint was filed and served—is the precise pattern Morgan was designed to prevent. A party cannot test the litigation waters, receive an unfavorable development, and then retreat to arbitration as a fallback. That is gamesmanship the Supreme Court foreclosed.

119. Furthermore, the purported arbitration agreement is structurally defective. It was executed by a third party, Endeavor (SVP Elyse Kazam), on November 27, 2023, approximately five months after Endeavor completed its sale of IMG Academy on June 28, 2023, and therefore lacked the requisite corporate authority to bind NCSA. (**Exhibit F**, *Arbitration Agreement*).

120. In addition, Section 9 of the cited agreement mandates absolute confidentiality, which unconscionably shields FMLA violations from public scrutiny. This provision undermines the statutory enforcement purposes of the FMLA and violates Florida public policy regarding transparency in employment disputes.

## FIRST CAUSE OF ACTION

### FMLA Interference (29 U.S.C. § 2615(a)(1))
*(Against All Defendants)*

121. Plaintiff incorporates paragraphs 1–120.

122. Plaintiff was an eligible employee under the FMLA.

123. Defendants interfered with, restrained, and denied Plaintiff's FMLA rights by failing to designate the leave, provide required notices, restore his position and benefits, and by terminating him during protected leave while using the leave as a negative factor.

124. These violations were willful; Defendants had no good-faith belief that their actions complied with the FMLA.

125. Plaintiff is entitled to back pay, front pay, liquidated damages (double), interest, benefits restoration, and equitable relief.

## SECOND CAUSE OF ACTION

### FMLA Retaliation (29 U.S.C. § 2615(a)(2))
*(Against All Defendants)*

126.  Plaintiff incorporates paragraphs 1–125.

127.  Plaintiff exercised FMLA rights by providing notice and taking protected leave.

128.  Defendants subjected him to adverse employment action (termination).

129.  A causal connection exists through close temporal proximity, pretext (sudden "discovery" of long-known charges immediately after the June 30 work-email court filing and during protected leave), disparate treatment of other employees' absences, and prior retaliatory conduct (Ladd's "you're going to need it very soon" threat). Defendants' stated reason is false and pretextual. The violations were willful; liquidated damages apply.

## THIRD CAUSE OF ACTION

### Tortious Interference with Advantageous Business Relationship
### (Florida Common Law)

*(Against Individual Defendants Strasman, Ladd, and Grossman)*

130. Plaintiff incorporates paragraphs 1–129.

131. Plaintiff had an advantageous employment relationship with NCSA with a reasonable expectancy of continuation.

132. The individual Defendants knew of the relationship and intentionally and unjustifiably interfered by orchestrating and approving the pretextual termination during protected FMLA leave, relying on charges now reflected in the record of that matter to have been levied against Plaintiff pursuant to a perjured complaint and false report.

133. This interference caused Plaintiff's total loss of employment, benefits, career trajectory, and housing, resulting in homelessness.

134. The interference was malicious and reckless; punitive damages are available.

## FOURTH CAUSE OF ACTION

### Defamation Per Se (Florida Common Law)
*(Against All Defendants)*

135. Plaintiff incorporates paragraphs 1–134.

136. Defendants published false and defamatory statements to Plaintiff's colleagues and third parties asserting that Plaintiff's employment was terminated for "job abandonment."

137. These statements were factually false. Defendants had actual notice of Plaintiff's protected FMLA leave and had observed Plaintiff's physical and emotional distress for months prior.

138. By publishing the "job abandonment" narrative, Defendants intended to, and did, impute a lack of professional integrity and a failure to perform the duties of Plaintiff's trade and profession.

139. These statements constitute defamation per se; damages are presumed.

## FIFTH CAUSE OF ACTION

### Defamation Per Se (Florida Common Law)
*(Against All Defendants)*

140.  Plaintiff incorporates paragraphs 1–139.

141.  In written correspondence dated March 25, 2026, Defendants published statements characterizing Plaintiff's federally protected FMLA leave as a "sham" and asserting that Plaintiff faced "pending incarceration."

142.  These statements are patently false and are directly refuted by the objective court record and Plaintiff's documented medical history.

143.  Defendants published the "sham" and "incarceration" narrative with actual malice and a reckless disregard for the truth.

144.  Specifically, Defendants refused to review exculpatory evidence and the public court docket—which Plaintiff had repeatedly brought to their attention—which confirms the charges are unadjudicated and destined for dismissal.

145.  This deliberate ignorance of exonerating evidence was intended to destroy Plaintiff's career and manufacture a pretext for the unlawful termination of a mission-critical employee.

146. These statements constitute defamation per se as they falsely impute the commission of a crime and professional unfitness; damages are presumed.

147. Because Defendants acted with actual malice, Plaintiff is entitled to punitive damages.

## SIXTH CAUSE OF ACTION

### Bad Faith Threats to Compel Arbitration (Florida Abuse of Process)
*(Against All Defendants)*

148. Plaintiff incorporates paragraphs 1–147.

149. On March 26, 2026, Defendants threatened to "move to compel arbitration and seek the fees and costs of doing so" against pro se plaintiff rendered homeless by their unlawful termination. (**Exhibit E**, *Grob Emails*).

150. This threat lacked probable cause, as:

   a. arbitration waived via merits litigation per *Morgan v. Sundance*, 596 U.S. 411 (2022);

   b. executed by unauthorized third party (Endeavor post-sale);

   c. the unenforceable arbitration agreement's unconscionable confidentiality clause.

151. Defendants used threatened legal process for the improper purpose of suppressing meritorious FMLA claims through economic intimidation of a vulnerable pro se litigant.

152. Plaintiff suffered emotional distress, interference with statutory rights, and legal intimidation as proximate result.

153. The conduct was willful and malicious; punitive damages are warranted.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against all Defendants, jointly and severally, as follows:

i. Compensatory damages, including back pay (minimum $30,270 through resolution plus ongoing losses), front pay (multi-year projection at $157,500+ given career destruction, stigma from baseless charges despite the filings and exhibits Plaintiff encouraged for review, and homelessness cascade), restoration of benefits, and interest;

ii. Liquidated damages (double all economic losses) for willful FMLA violations;

iii. Noneconomic/compensatory damages for emotional distress, reputational harm, and the homelessness cascade;

iv. Punitive damages (uncapped under Florida tort claims);

v. Attorney's fees and costs under 29 U.S.C. § 2617(a)(3) and Florida law;

vi. Pre-judgment and post-judgment interest; and

vii. Any other relief the Court deems just and proper.

## DEMAND FOR JURY TRIAL

**PLAINTIFF DEMANDS A TRIAL BY JURY** on all issues so triable.

Respectfully submitted,

/s/ **Kenneth Carl Salazar, Jr.**
Kenneth Carl Salazar, Jr., Plaintiff, Pro Se
carl-salazar@outlook.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this 11th day of April, 2026, a true and correct copy of the foregoing was filed electronically with the Clerk of Court and will be served via formal process (Summons) upon the following Defendants:

**NCSA College Recruiting (D/B/A/ IMG ACADEMY),**
5725 Bollettieri Blvd., Bradenton, FL 34210

**Lisa M. Strasman,**
933 Thackeray Dr., Highland Park, IL 60035

**Michael J. Ladd,**
7517 Kedvale Ave., Skokie, IL 60076

**Joel Grossman,**
8926 Pottawattami Dr., Skokie, IL 60076

**/s/ Kenneth Carl Salazar, Jr.**
Kenneth Carl Salazar, Jr., Plaintiff, Pro Se
carl-salazar@outlook.com

## CERTIFICATE OF COMPLIANCE

**I HEREBY CERTIFY** that this Complaint complies with the typography and formatting requirements of Local Rule 1.08. This document was prepared using Bookman Old Style, a proportionally spaced serifed font, in 13-point type.

**Dated**: April 11, 2026

**/s/ Kenneth Carl Salazar, Jr.**
Kenneth Carl Salazar, Jr., Plaintiff, Pro Se
carl-salazar@outlook.com